1

2

3

4

5

6

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

7

8

SECURITIES AND EXCHANGE
COMMISSION,

Case No.2:23-CV-173  JCM (EJY)

9

Plaintiff(s),

ORDER

10

v.

11

STEVEN J. SUSOEFF and STEVE
SUSOEFF, LLC,

12

Defendant(s).

13

14

15

16

Presently before the court is defendants Steven Susoeff and Steve Susoeff LLC's (collectively, "defendants") motion in limine.  (ECF No. 11).  Plaintiff Securities and Exchange Commission (the "SEC") filed a response.  (ECF No. 21).

17

18

19

Also before the court is defendants' motion for summary judgment.  (ECF No. 14).  The SEC filed a response (ECF No. 22), to which defendants replied.  (ECF No. 23).

20

I.    **Background**

21

22

23

24

25

26

27

This action arises from Steven Susoeff's alleged "cherry-picking" stock trading scheme. (*See generally* ECF No. 1).  The gravamen of the SEC's complaint is that Susoeff, an investment adviser, disproportionately allocated winning trades to the accounts of his girlfriend, his associate, and himself (the "favored accounts").  (*Id*. at 3).  The SEC's complaint alleges the defendants violated Section 10(b) of the Exchange Act, Rule 10b-5(a) and (c); Sections 17(a)(1) and (3) of the Securities Act; and Section 206(1) and 206(2) of the Advisers Act.  (*Id*.).

28

The following facts are undisputed.  Steven Susoeff, a registered investment adviser, is the sole owner and employee of Steve Susoeff LLC, doing business as Meritage Financial Group ("Meritage").  (ECF No. 1, at 4; ECF No. 22, at 2).  Defendants provided investment advice using their clients' accounts to buy and sell securities and charged an advisory fee.[1]  (ECF No. 1, at 5).

Susoeff and Meritage were "investment advisers under Section 202(a)(11) of the Advisers Act, 15 U.S.C. §80b-2(a)(11), because they provided investment advice for compensation to their clients regarding securities."  (*Id*. at 4).

Susoeff's general practice was to execute trades on behalf of his clients using a "block account."  (ECF No. 22, at 3).  A block account allows an investment adviser to execute a single order, a block trade, for multiple clients simultaneously.  (*Id*. at 3).  After the order is placed, the shares or proceeds are allocated to the clients' accounts.  (*Id*.).

The block account did not require Susoeff to specify how he would allocate his trades.  (*Id*. at 4).  Instead, Susoeff could execute block trades and allocate the trades among client accounts later in the day.  (*Id*.).  Susoeff repeatedly allocated trades hours later or at the end of the day.  (*Id*.).  On at least six occasions, Susoeff waited too long to allocate his trades under TD Ameritrade's policies, triggering warnings and penalty fees.  (*Id*.).

From January 2021, through July 2021, the favored accounts profited from 98% of the allocated day trades, earning $151,467.00, which represented 0.61% of daily allocation returns.  (*Id*. at 6).  In stark contrast, none of those trades were allocated to other accounts, resulting in a negative 0.60% rate of return on investment.  (*Id*.).

In July 2021, TD Ameritrade notified Susoeff that he must discontinue block trading and

---

[1] Susoeff had discretionary authority over his clients' accounts; he did not need permission to place trades.  (ECF No. 22, at 2).

could trade only in individual accounts.  (*Id*.).  On October 19, 2021, the broker terminated its relationship with defendants "due in part to concerns with trading activity by Meritage Financial." (*Id*.).

Susoeff owed fiduciary duties to his clients, which is reflected in Meritage's Code of Ethics, adopted by Susoeff.  (*Id*. at 3).  Meritage's client brochure stated that "block trades would be allocated fairly and without additional compensation or renumeration for Meritage or Susoeff." (*Id*. at 3-4).

## II.      Motion for Summary Judgment

The court has sufficient information to decide the instant motions based on the filings and thus denies any request for oral argument.  LR 78-1.

### A.  Legal Standard

The Federal Rules of Civil Procedure allow summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits (if any), show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Information may be considered at the summary judgment stage if it would be admissible at trial.  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citing *Block v. Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence.  Rather, it draws all inferences in the light most favorable to the nonmoving party.  *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987).

- 3 -

When the non-moving party bears the burden of proof at trial, the moving party can meet its burden on summary judgment in two ways: (1) by presenting evidence to negate an essential element of the non-moving party's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied, and the court need not consider the non-moving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.

However, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex*, 477 U.S. at 324. If the nonmoving party's evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

. . .

. . .

- 4 -

1

2

B.  Discussion

3

1.  Admissibility of Evidence

4

As an initial matter, defendants attempt to argue that Bonnie Moore's declaration is

5

inadmissible because "there is no showing Ms. Moore will be available for trial or would appear

6

to testify." (ECF No. 23, at 5).  Moore's declaration states that "if called as a witness, [she] would

7

competently testify to [the declaration's matters]."  (ECF No. 22, Ex. 13, at 501).  Therefore, the

8

court finds that Moore's declaration may be considered.  *See Fraser*, 342 F.3d at 1036.

9

10

2.  Violations of Section 10(b) of the Exchange Act, Rule 10b-5(a) and (c), and
Sections 17(a)(1) and (3) of the Securities Act

11

The SEC's first claim alleges that defendants engaged in fraud in connection with the

12

purchase or sale of securities.  (ECF No. 1, at 11).  The SEC's second claim alleges that defendants

13

engaged in fraud in the offer or sale of securities.  (*Id*. at 12).

14

15

Section 10(b) of the Securities Exchange Act makes it "unlawful for any person . . . [t]o

16

use or employ, in connection with the purchase or sale of any security . . . any manipulative or

17

deceptive device" in violation of SEC rules.  15 U.S.C. § 78j(b).  "Liability under Section 10(b)

18

and Rule 10b-5 . . . requires evidence of (1) a material misrepresentation, (2) in connection with

19

the purchase or sale of a security, (3) with scienter, (4) by means of interstate commerce." *SEC v.*

20

*Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011).

21

22

SEC Rule 10b-5 states, in relevant part,

23

It shall be unlawful for any person . . . (a) [t]o employ any device, scheme, or artifice

24

to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state
a material fact necessary in order to make the statements made . . . not misleading,

25

or (c) [t]o engage in any act, practice, or course of business which operates or would
operate as a fraud or deceit upon any person, in connection with the purchase or

26

sale of any security.

27

17 C.F.R. § 240.10b-5(a)-(c).

28

- 5 -

Section 17(a) of the Securities Act of 1933 makes it unlawful "for any person in the offer or sale of any securities . . ."

> (1) to employ any device, scheme, or artifice to defraud, or […] (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a)(1)-(3).

Defendants set forth three of the same arguments against the SEC's first and second claim: (1) the SEC does not have jurisdiction over defendants as state-registered investment advisers; (2) the SEC has not presented evidence that Susoeff used "mails or means and instrumentalities of interstate commerce;" and (3) the SEC cannot establish scienter as an element of its claims.  (ECF No. 14).

### a. State-registered investment advisers

First, defendants argue that the SEC does not have jurisdiction to pursue the instant action because Susoeff is a state-registered investment adviser.  The defendants have failed to provide any evidence suggesting the SEC cannot allege violations in its first and second claims against a state-registered investment adviser.

The law is clear that it is unlawful for "any person…," not specifically "SEC-registered investment advisers."   15 U.S.C. § 77q; 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a)-(c). Therefore, the SEC may properly maintain its first two claims against defendants.

### b. Interstate commerce

Second, defendants question "where was the use of the mails or means and instrumentalities of interstate commerce?"  (ECF No. 14, at 5).

The Securities Act defines interstate commerce to include "trade or commerce in securities or any transportation or communication relating thereto among the several States."  15 U.S.C. §

77b(a)(7).  The Exchange Act and Advisory Act provides that interstate commerce and the means and instrumentalities of interstate commerce include the use of any national securities exchange. 15 U.S.C. §§ 78c(a)(17); 80b-2(a)(14).

Susoeff placed orders on behalf of his clients through a national exchange, TD Ameritrade, to execute the trades.  (ECF No. 22, at 9).  Thus, a reasonable jury could conclude that defendants' scheme meets the interstate commerce element of the SEC's claims.

> c.  *Scienter*

Third, defendants argue that Susoeff's alleged actions do not rise to the level of scienter. (ECF No. 14).

Scienter is the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  A showing of knowing or reckless conduct is sufficient to meet the element of scienter.  *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003). The SEC need not prove scienter for a violation of Section 17(a)(3) of the Securities Act.  *See Aaron v. SEC*, 446 U.S. 680, 697 (1980).

As an initial matter, defendants' motion relies on Susoeff's declaration that denied participating in a scheme and that such a scheme even existed.  (ECF No. 14, at 6).  However, defendants reply explicitly states—"this is a cherry-picking case."  (ECF No. 23, at 3).  "Cherry-picking axiomatically constitutes [a scheme to defraud]."  *SEC v. Kellen*, 2021 WL 4907238, at *6 (C.D. Cal. Sept. 14, 2021) (citing *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1304 (S.D. Fla. 2007).  Thus, a reasonable jury could conclude that a scheme existed.

Next, the court must determine whether a reasonable jury could find that defendants' scheme rises to the level of scienter.  The favored accounts won 98% of the allocated day trades, representing 0.61% daily allocation returns from January 2021, through July 2021.  (ECF No. 22,

at 6).  The SEC has provided an expert report showing that the odds of achieving these results are less than one in a million.  (*Id*.).

Susoeff's practice was to wait until the end of the day to allocate block trades.  (*Id*. at 5). A jury could reasonably conclude that a scheme existed where the evidence shows Susoeff waited in order to determine how to allocate profitable trades.  A reasonable jury could further conclude that Susoeff's conduct was reckless or that he had knowledge of the scheme.

On at least six occasions, Susoeff waited too long to allocate trades.  (*Id*.).  It is reasonable to infer that Susoeff was systemically disadvantaging certain clients and favoring others—his girlfriend, his friend, and himself.  In fact, the SEC has provided evidence showing that none of the day trades between January 2021, through July 2021, allocated to other clients were winning trades.  (*Id*. at 6).

Viewing the evidence in light most favorable to the SEC, there exists a genuine issue of material fact whether defendants' scheme meets the element of scienter.

### 3.   Violations of Sections 206(1) and 206(2) of the Advisers Act

The SEC's third claim alleges that defendants engaged in fraud by an investment adviser. (ECF No. 1, at 13).

Sections 206(1) and 206(2) of the Advisers Act make it "unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—(1) to employ any device, scheme, or artifice to defraud any client or prospective client; [or] (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."  15 U.S.C. §§ 80b-6(1)-(2).

Defendants set forth nearly the same arguments already addressed by the court.

. . .

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### a.   State-registered advisers

First, defendants argue that the provisions of the Advisers Act alleged here do not apply to state-registered advisers.  (ECF No. 14, at 14).

Defendants, in conclusory fashion, posit that most provisions of the Advisers Act apply only to SEC-registered advisers.  (*Id*.).  Defendants have not pointed to a relevant section of the Act that does not apply to state-registered advisers.  The language in Section 206 of the Act is explicit, stating it is "unlawful for *any* investment adviser…"  15 U.S.C. §§ 80b-6.

Defendants then contradict their previous contention and posit that "[s]tate-registered advisers are subject to Section 206 of the Advisers Act (15 USCS § 80b-6).  (ECF No. 14, at 14).  This is the exact statute under which the SEC's alleged violations fall under.  (ECF No. 1, at 13).  It is undisputed that Susoeff is a state-registered adviser.  (*See generally* ECF No. 14).  Therefore, the SEC may properly maintain its third claim against defendants.

### b.   Materiality under the Advisers Act

Second, defendants argue that the SEC cannot show that defendants failed to disclose or omitted material facts in their client dealings for a Section 206(2) violation.  Defendants also posit that the SEC must first prove a cherry-picking scheme existed.  The court has already found that such a scheme existed and defendants themselves admit "this is a cherry-picking case."  (ECF No. 23, at 3).

To prove a Section 206(1) violation, plaintiffs must show that a defendant, (1) was an investment adviser; (2) utilized the mails or instrumentalities of interstate commerce to employ a device, scheme or artifice; (3) the device, scheme or artifice violated a defendant's fiduciary duty to his clients in that he made false and misleading statements or omissions of material fact to his clients; and (4) acted with scienter.  *SEC v. Langemeier*, 2024 WL 664452, at *12 (D. Nev. Feb.

16, 2024) (citing *S.E.C. v. Criterion Wealth Mgmt. Servs., Inc.*, 599 F. Supp. 3d 932, 947 (C.D. Cal. Apr. 25, 2022).

Fiduciary obligations imposed by Sections 206(1) and 206(2) include disclosing all material facts to clients. *See, e.g., SEC v. Sztrom*, 538 F. Supp. 3d 1050, 1056 (S.D. Cal. May 11, 2021) (citing *SEC v. Capital Gains*, 375 U.S. 180, 194 (1963)). "Failure to disclose material facts must be deemed fraud or deceit within [the Advisers Act's] intended meaning[.]" *Capital Gains*, 375 U.S. at 200.

The SEC argues that a conflict of interest is a material fact. "[P]otential conflicts of interest are 'material' facts with respect to clients and the Commission." *Vernazza*, 327 F.3d at 859. The SEC then argues that Susoeff's preference over certain accounts that received favorable trades poses a conflict of interest. (ECF No. 22, at 11).

It is reasonable to infer that Susoeff preferred certain accounts that received favorable trades, as opposed to other client accounts. A reasonable jury could then conclude that failure to disclose allocated trades made to the favored accounts is fraud or deceit within the Act's meaning. Thus, there exists a genuine issue of material fact as to whether defendants breached their fiduciary obligations imposed by the Advisers Act.

### c.  Scienter

Next, defendants argue that the SEC is unable to prove scienter as an element of the alleged Section 206(1) violation. (ECF No. 14, at 15).

"[S]cienter is a required element for violations of . . . Advisers Act § 206(1)" but it "is not required for" violations of § 206(2), simple negligence is enough. *Vernazza v. S.E.C.*, 327 F.3d 851, 860 (9th Cir.), *amended*, 335 F.3d 1096 (9th Cir. 2003); *see also SEC v. Sisu Cap., LLC*, 2024 WL 2941629, at *3 (N.D. Cal. June 10, 2024) (citing *Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 472

- 10 -

(D.C. Cir. 2019).

The court need not rehash its analysis of scienter because it has already determined that a reasonable jury could conclude that defendants' scheme rises to the level of scienter. *See Pac. Elec. Contractors Ass'n*, 809 F.2d at 630–31.

### 4. Damages

Defendants attempt to bring a discovery-like dispute before this court, arguing the SEC has failed to disclose any damage calculations for its request of disgorgement and civil penalties. (ECF No. 14, at 8). This argument is misplaced. The SEC has set forth evidence supporting its request for disgorgement and civil penalties through its expert witness report, which defendants acknowledge in their motion. (*See generally* ECF No. 22; ECF No. 14, at 3).

Therefore, the court declines to grant summary judgment against the SEC's three claims.

## III.     Motion in Limine

### A. Legal Standard

"The court must decide any preliminary question about whether…evidence is admissible." Fed. R. Evid. 104. Motions *in limine* are procedural mechanisms by which the court can make evidentiary rulings in advance of trial, often to preclude the use of unfairly prejudicial evidence. *United States v. Heller*, 551 F.3d 1108, 1111–12 (9th Cir. 2009); *Brodit v. Cambra*, 350 F.3d 985, 1004–05 (9th Cir. 2003).

Motions *in limine* may be used to exclude or admit evidence in advance of trial. *See* Fed. R. Evid. 103; *United States v. Williams*, 939 F.2d 721, 723 (9th Cir. 1991) (affirming district court's ruling in limine that prosecution could admit impeachment evidence under Federal Rule of Evidence 609).

Judges have broad discretion when ruling on motions *in limine*. *See Jenkins v. Chrysler*

*Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002).  "[I]n limine rulings are not binding on the trial judge [who] may always change his mind during the course of a trial."  *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000); *accord Luce*, 469 U.S. at 41 (noting that *in limine* rulings are always subject to change, especially if the evidence unfolds in an unanticipated manner).

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  Fed R. Evid. 702.

The district court serves a gatekeeper function in evaluating scientific testimony.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  When a district court is faced with a proffer of scientific testimony, it must make a preliminary determination under FRE 702 whether the reasoning or methodology underlying the testimony is scientifically valid.  *Id.* at 592–93.  The key test for validity here is not "the correctness of the expert's conclusions but the soundness of his methodology."  *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1191–92 (9th Cir. 2007) (*citing Daubert*).

The Supreme Court has given the courts a list of non-exclusive factors to consider when determining whether expert testimony is reliable under Rule 702.  "These include: whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can be and has been tested; whether the known or potential rate of error is acceptable;…[and] whether experts are testifying about matters growing naturally out of their own independent research, or if they have developed

their opinions expressly for purposes of testifying." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (cleaned up).

The trial court must also keep out expert testimony that is not relevant and has broad latitude in exercising this function. *Cooper v. Brown*, 510 F.3d 970, 942 (9th Cir. 2007). The court, as the proponent of evaluating whether an expert's testimony is relevant, should not limit its consideration to the strength or existence of the expert's opinion. *See United States v. Rahm*, 993 F.2d 1405, 1411 (9th Cir. 1993). Instead, the ultimate consideration is whether the expert's testimony would assist the jury in drawing their own conclusion as to a fact at issue. *Id.*

B. Defendants' motion to exclude Dr. Evgeny Orlov's expert report, opinions, and testimony.

The SEC proffers Dr. Orlov as an expert witness who has spent more than five years at the SEC, providing financial, economic, and statistical analysis in SEC investigations, including cherry-picking investigations. (ECF No. 21, at 4). Dr. Orlov analyzed defendants' trades and allocations in this action. (*Id.* at 1). A review of his report suggests he will provide similar testimony at trial.

In Dr. Orlov's opinion, Meritage's trading between January 1, 2021, and July 31, 2021, showed clear signs of cherry-picking. (ECF No. 11, Ex. A, at 6). Dr. Orlov goes on to opine that the favored accounts experienced higher returns when allocation took place; Susoeff generally allocated trades after observing whether the trades were profitable; approximately 89% of dollars traded in the favored accounts were day trades, as opposed to a 1% figure for disfavored accounts; and the ill-gotten gains that went to favored accounts equaled $144,566.00. (*Id.* at 6-7).

Defendants now move this court to exclude Dr. Orlov's expert report, opinions, and testimony. (ECF No. 11). They argue, among other contentions, that Dr. Orlov's opinions are biased based on his employment, that he used ill-suited tests, and that he failed to look at the

1    totality of the evidence.  (*Id*.).

2         The court finds that there is insufficient reason to exclude Dr. Orlov's report, opinions, and

3    testimony.  The court is primarily concerned with defendants setting forth unsupported arguments

4    such as "Dr. Orlov was clearly swayed by virtue of his employment, and he should be disqualified

5    in this case, as his opinions are clearly unreliable."  (*Id*. at 8).  Defendants imply that a conflict of

6    interest exists where the SEC has a financial interest in the outcome of the action.  (*Id*. at 4-5).

7    The court will disregard such frivolous arguments.  Defendants have failed to provide this court

8    with anything other than conclusory arguments that Dr. Orlov's opinions are biased.

9         Next, the court finds that Dr. Orlov's opinions about defendants' trading and allocation are

10   reliable.  Dr. Orlov reviewed more than 90,000 securities transactions from March 2017, to

11   October 2021.  (ECF No. 21, at 8).  In doing so, Dr. Orlov employed several tests and analyzed all

12   the data available to soundly conclude that defendants' trading is consistent with cherry-picking.

13   (*Id*. at 9).

14

15        Rule 702 is meant to "screen" out "unreliable nonsense opinions, ... not exclude opinions

16   merely because they are impeachable".  *City of Pomona v. SQMN. Am. Corp.*, 750 F.3d 1036, 1044

17   (9th Cir. 2014).  Defendants' disagreement with Dr. Orlov's opinions goes to credibility, not

18   reliability.  Such disagreements may be raised at trial.  The court finds that Dr. Orlov's testimony

19   would "assist the jury in drawing their own conclusion as to a fact at issue." *See Rahm,* 993 F.2d

20   at 1411.

21

22        Finally, the court does not find it necessary to hold a *Daubert* hearing.  Defendants' motion

23   to exclude Dr. Orlov's report, opinions, and testimony (ECF No. 11) is denied.

24   . . .

25   . . .

26

27

28

- 14 -

IV.   **Conclusion**

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendants' motion in limine (ECF No. 11) is DENIED.

IT IS FURTHER ORDERED that defendants' motion for summary judgment (ECF No. 14) be, and the same hereby is, DENIED.

DATED August 23, 2024.

_____
UNITED STATES DISTRICT JUDGE